# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| | |
|---|---|
| JERYL WALLACE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CAUSE NO. 1:14-cv-00240-SLC |
| ) | |
| COMMISSIONER OF SOCIAL ) | |
| SECURITY, ) | |
| ) | |
| Defendant. ) | |

## OPINION AND ORDER

Plaintiff Jeryl Wallace appeals to the Court from a final decision of the Commissioner of Social Security denying her application under the Social Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB").[1] (DE 1). For the following reasons, the Commissioner's decision will be REVERSED, and the case will be REMANDED to the Commissioner for further proceedings in accordance with this Opinion and Order.

## I. PROCEDURAL HISTORY

Wallace applied for DIB in April 2013, alleging disability as of February 22, 2013. (DE 11 Administrative Record ("AR") 149-50, 179). The Commissioner denied Wallace's application initially and upon reconsideration, and Wallace requested an administrative hearing. (AR 72-108). On December 3, 2013, a hearing was conducted by Administrative Law Judge Jennifer Fisher ("the ALJ"), at which Wallace, who was represented by counsel at the time; Wallace's friend, Julie Burke; and a vocational expert ("VE") testified. (AR 35-71). At the

---

[1] All parties have consented to the Magistrate Judge. (DE 15); *see* 28 U.S.C. § 636(c).

close of the hearing, Wallace amended her alleged onset date from February 22, 2013, to April 1, 2012. (AR 69-70, 178).

On April 25, 2014, the ALJ rendered an unfavorable decision to Wallace, concluding that she was not disabled because despite the limitations caused by her impairments, she could perform her past relevant work as a clerical worker as she actually performed it. (AR 17-29). The Appeals Council denied Wallace's request for review (AR 7-10), at which point the ALJ's decision became the final decision of the Commissioner. *See* 20 C.F.R. § 404.981.

Wallace filed a complaint with this Court on August 7, 2014, seeking relief from the Commissioner's final decision. (DE 1). Wallace advances three arguments in this appeal: (1) that the ALJ's step-one finding that she had performed substantial gainful activity ("SGA") from August 2012 through February 2013 is not supported by substantial evidence; (2) that the ALJ's step-four finding is not supported by substantial evidence because the residual functional capacity ("RFC") assigned by the ALJ and the hypothetical posed at step five failed to account for her frequent bathroom needs and mental impairments; and (3) that the ALJ's credibility determination defies meaningful review and is "patently wrong." (DE 18 at 7-16).

## II. FACTUAL BACKGROUND[2]

### *A. Background*

At the time of the ALJ's decision, Wallace was 59 years old (AR 241); had a high school education (AR 183); and had past work experience as a clerical worker, dispatcher, factory worker, and in customer service (AR 192). Wallace alleges disability due to multiple sclerosis ("MS"); anal/rectal cancer in remission; osteoporosis; anxiety; depression; torn meniscus in

---

[2] In the interest of brevity, this Opinion recounts only the portions of the 639-page administrative record necessary to the decision.

2

2008; memory loss; concentration difficulties; asthma; numbness, tingling, and pain in extremities; and spinal compression fractures. (AR 182).

### B. *Wallace's Testimony at the Hearing*

At the hearing, testimony revealed that Wallace was diagnosed with anal/rectal cancer in April 2012 and underwent chemotherapy and radiation. (AR 38). She also has MS, which she asserted causes her to feel tired and achy. (AR 47). For the MS, she takes an interferon injection once a week, which gives her flu-like symptoms for the next day or two; she takes the injections on Sunday nights. (AR 47, 55). She uses an inhaler for asthma, but had not been using it recently. (AR 48, 53-54). She also was wearing a back brace at the time due to spinal compression fractures. (AR 48-49).

Wallace testified that at some point prior to April 2012, she had reduced her 40-hour workweek to 32 or 36 hours due to her MS so that she had one full or half-day off per week. (AR 43-44, 61). After she was diagnosed with cancer in April 2012, Wallace went off work while undergoing treatment. (AR 42). In August 2012, after her cancer treatments were completed, Wallace felt she had to return to work or lose her job and health benefits (AR 42); she stated that although she has health insurance through her husband, she was "double-insured" and needed both insurances for her cancer treatments. (AR 63). In August 2012, she returned to clerical work at 32 hours a week with Wednesdays off. (AR 43-44).

Once back to work, Wallace missed about two days of work per month, which included time for her doctor appointments. (AR 42, 44, 53). She took four or five 15-minute breaks throughout the day for her bathroom needs; she wears protective undergarments and had two accidents at work that necessitated changing her clothes. (AR 44-46, 50). She did not request

3

any formal accommodations at work and was not sure if her employer was aware of all of her breaks, explaining that although she had to meet a daily quota of "charts done," she was able to work at her own pace. (AR 51, 53). Although she felt like she made more mistakes because of her bathroom interruptions, her employer did not note any mistakes in her work; she did receive one reprimand between August 2012 and February 2013 for not meeting her daily quota. (AR 34, 45-46, 53). The job was a temporary position and ended on February 22, 2013, when the project was completed. (AR 40, 42).

When asked what prevented her from working full-time or returning to her past job at 32 hours, Wallace cited her achiness, diarrhea, and fatigue. (AR 50). Her doctors told her that the diarrhea is "something [she's] going to have to live with" and to take Imodium when she needed better control; she said the Imodium is effective in controlling her diarrhea, but her doctors told her not to use it all the time. (AR 55-56). She also was not sleeping well due to pain in her back and cramps in her legs, which wake her four to five times a night; she tries to take a 20-minute "power nap" in the afternoon several times a week. (AR 56-57). She also said that due to her back problems, she could sit for just 40 minutes before needing to get up and move for 30 minutes. (AR 57).

As to her mental health, Wallace stated that she has anxiety and depression, but that it was "controlled" by Prozac. (AR 51). She was "not sure" whether her anxiety and depression impacted her ability to work. (AR 51). She also complained of a history of urinary infections, which in the past caused her to miss two days of work a month; some knee pain, which did not impact her work; and some trouble gripping with her hands, which she attributed to the MS. (AR 51-52, 54). In addition, she reported chronic dry eye, which started after her job ended in

4

February 2013, which limits her from reading or working on the computer at length.³ (AR 54-55).

## C. Summary of the Medical Evidence

Wallace was diagnosed with MS in September 2005. (AR 286, 294, 573, 583). She manages the MS with weekly interferon injections. (*See, e.g.*, AR 476, 512, 518, 535, 546). In May 2009, Wallace had an MRI of her brain; the results indicated that her MS was "stable." (AR 583).

In April 2012, Wallace was diagnosed with anorectal cancer; she underwent chemoradiation therapy from May through July 2012 (AR 281, 286, 290, 315-75) and developed diarrhea during her treatment (AR 290, 298, 314, 317, 322, 325, 329, 516). The diarrhea has continued even though her cancer treatments were completed in July 2013 and her cancer is in remission. (AR 290, 302, 312, 513, 517, 590).

In October 2012, Wallace's treating neurologist, Dr. Michael Englert, documented that her MS was "stable" with her current treatment. (AR 465).

In November 2012, Wallace underwent a physical exam by her family physician, Dr. Carolyn Hudson. (AR 491-97). Wallace's cancer treatments were completed by that time, and she reported that she was "doing well." (AR 491). She told the doctor that her bowel movements were "pretty 'normal.'" (AR 491). She denied any joint pain and stated that "her MS [was] doing so well, she does not even recognize it." (AR 491). She elaborated that "[s]he

---

³ Wallace's friend, Julie Burkee, also testified at the hearing on Wallace's behalf. (AR 58-63). She essentially corroborated Wallace's testimony, but added that Wallace has developed memory problems since her cancer. (AR 59-60). She also stated that Wallace downplays her depression, reporting that Wallace becomes tearful, emotional, and has talked of suicide. (AR 60). She asserted that Wallace returned to work in August 2012 mainly because she was worried about losing her health insurance. (AR 62).

does not even know she has [MS] until she has to take her medication once a week." (AR 491).

In March and July 2013, Wallace was diagnosed with compression fractures of her thoracic and lumbar spine of unknown origin, as well as osteopenia and osteoperosis. (AR 478, 480, 486-87, 496, 547-52, 551, 554-55, 599-601). An MRI in August 2013 also revealed anterolisthesis at the L4-S1 levels of her lumbar spine with degenerative changes and mild-to-moderate right foraminal narrowing. (AR 551-52). For her back condition, she wears a back brace for support and takes medication. (AR 474).

Wallace has also been diagnosed with anxiety, a panic disorder, and depression. (AR 478, 496, 521). She complains of memory problems, anhedonia, thoughts of dying, poor concentration, feelings of worthlessness, and anxiety about her diarrhea. (AR 517-18). She reported having suicidal thoughts. (AR 518).

On June 19, 2013, Wallace saw Dr. Shashank Kashyap for a disability physical. (AR 512-15). Wallace rated her pain as a "four" or "five" on a ten-point scale. (AR 512). Dr. Kashyap's findings included that Wallace had edema in both ankles; diarrhea; back, joint, and muscle pain; muscle cramps; reduced range of motion; headaches; and anxiety and depression. (AR 513). She was wearing a back brace at the examination. (AR 514). Her remote and recent memory were intact, and her attention span was normal. (AR 514). Her muscle strength and grip strength were normal; she had normal tandem and toe/heel walking, and no tenderness to palpation of her spine. (AR 514). Dr. Kashyap noted that Wallace was "chronically fatigued and weak." (AR 514). In her medical source statement, Dr. Kashyap wrote that Wallace, per her report, could sit for 30 minutes at a time, stand for 30 minutes at a time, walk six minutes slowly, and lift 10 to 20 pounds. (AR 514). She had normal fine motor skills and normal concentration.

6

(AR 514). Although she complained of memory difficulty, her memory was intact during the examination. (AR 514).

On June 20, 2013, Wallace saw Stefanie Wade, Psy.D., for a mental status examination at the request of the state agency. (AR 516-22). Wallace reported recent and past suicidal ideation and a history of panic attacks and diarrhea when in unfamiliar situations. (AR 516-18). Her panic attacks occurred once a month while she was working, and have since occurred once every other month. (AR 518). She stays home much of the time to minimize her risk of panic attacks; she does not think that her anxiety gets in the way of doing tasks at home, but applies more when she leaves home. (AR 518-20). Although Wallace complained of memory problems, testing revealed that her memory skills were average. (AR 519).

On a mental status examination, Wallace was tearful, and her mood was anxious and depressed; her persistence during the assessment was adequate. (AR 519). She did not think that her depressive symptoms cause her to leave tasks undone, but they do cause her to sometimes ignore the telephone and she has to force herself to shower. (AR 520). Her daily routine, which at the time did not involve work, appeared established, and she needed very little support from others to accomplish her daily tasks, which are simple in nature; as such, her ability to sustain her daily activities appeared only slightly impaired. (AR 520). She had a fair memory of task instructions and fair concentration; her stress tolerance was limited. (AR 520). Dr. Wade assigned her a current Global Assessment of Functioning ("GAF") score of 62 and highest-past-year GAF score of 63, reflective of only mild mental limitations, together with diagnoses of generalized anxiety disorder, panic disorder without agoraphobia, and major depressive disorder,

7

recurrent, moderate.[4] (AR 521-22).

On July 1, 2013, Dr. J. Sands, a state agency physician, reviewed Wallace's record and completed a physical RFC assessment. (AR 77-79). Dr. Sands found that Wallace could lift 10 pounds frequently and 20 pounds occasionally; stand or walk up to six hours in an eight-hour workday; sit up to six hours in an eight-hour workday; occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs; never climb ladders, ropes, or scaffolds; and must avoid concentrated exposure to hazards. (AR 77-79). Dr. Sands specifically noted that the record revealed Wallace had no muscle weakness, no tenderness to palpation of her spine, and normal heel/toe and tandem walking, and that she was independent with her self care, household tasks, and shopping. (AR 79).

That same date, Donna Unversaw, Ph.D., a state agency psychologist, reviewed Wallace's record and completed psychiatric review technique and mental RFC assessment forms. (AR 76-77, 79-81). On the psychiatric review technique, Dr. Unversaw indicated that Wallace had mild restrictions in daily living activities, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (AR 76). On the mental RFC assessment, Dr. Unversaw concluded that Wallace was moderately limited in maintaining attention and concentration for extended periods, completing a normal workday and workweek without interruptions from psychologically-based symptoms,

---

[4] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed., Text Rev. 2000). A GAF score of 61 to 70 reflects some mild symptoms or some difficulty in social, occupational, or school functioning, but "generally functioning pretty well." *Id*. "The American Psychiatric Association no longer uses the GAF as a metric." *Spencer v. Colvin*, No. 13-cv-1487, 2015 WL 684545, at *17 n.5 (C.D. Ill. Feb. 17, 2015) (citing Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 16 (5th ed. 2013)). However, because Dr. Wade used GAF scores in assessing Wallace, they are relevant to the ALJ's decision. *See id*. (citing *Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013)).

performing at a consistent pace without an unreasonable number and length of rest periods, and accepting instructions and responding appropriately to criticism from supervisors; she was not, however, significantly limited in any other mental activity. (AR 79-81). In her narrative summary, Dr. Unversaw concluded:

> [Wallace] is cap[able] of learning, remembering, and understanding unskilled and semiskilled tasks. She can attend and persist at acceptable levels. There are times that anxiety does impact her concentration, thus she will do best in settings that do not require close, sustained concentration nor high stress. She can interact with others at [a] level acceptable of most work settings. She will do best with a supervisor who is seen by her as understanding rather than critical. She can handle routine changes found in such work.

(AR 81).

In September 2013, Dr. Jerry Smartt, Jr., a state agency physician, reviewed Wallace's record and completed a physical RFC assessment. (AR 92-94). Dr. Smartt concluded that Wallace could lift 10 pounds frequently and 20 pounds occasionally; stand or walk up to six hours in an eight-hour workday; sit up to six hours in an eight-hour workday; occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs, but never climb ladders, ropes, or scaffolds; and must avoid concentrated exposure to hazards. (AR 92-94).

### III. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005)

9

(citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record, but does not "reweigh the evidence, resolve conflicts, decide questions of credibility," or substitute its judgment for the Commissioner's. *Id.* (citations omitted). Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## IV. ANALYSIS

### A. *The Law*

Under the Act, a claimant is entitled to DIB if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months . . . ." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. §

404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[5] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. § 404.1520. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

## B. The ALJ's Decision

On April 25, 2014, the ALJ issued the decision that ultimately became the Commissioner's final decision. (AR 17-29). She found at step one that Wallace had engaged in SGA from August 1, 2012, through February 22, 2013, and thus, that Wallace had not established that she was disabled for at least 12 consecutive months after her amended alleged onset date of April 1, 2012. (AR 19-20). Therefore, the ALJ considered the remaining steps of the sequential process for the period beginning February 23, 2013. (AR 19-20).

At step two, the ALJ concluded that Wallace had the following severe impairments: MS, osteopenia, asthma, thoracic fractures, arthritis, and history of anal/rectal cancer. (AR 20). At step three, the ALJ determined that Wallace's impairment or combination of impairments were not severe enough to meet a listing. (AR 23). Before proceeding to step four, the ALJ assigned Wallace the following RFC:

---

[5] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

11

> [T]he claimant has the [RFC] to lift/carry 10 pounds frequently; she can sit a total of 6 hours per workday; she can stand/walk a total of 4 hours per workday; she must alternate between sitting/standing about once per hour but can remain at her workstation; she can occasionally balance, stoop, and climb ramps and stairs; she can never climb ladders, ropes, or scaffolds; she can never kneel, crouch, or crawl; she cannot work in exposure to work-place hazards such as unprotected heights, "dangerous moving machinery," or slippery/uneven surfaces; she can sustain a flexible pace; and she can have incidental interaction with the public.

(AR 24).

Based on this RFC and the VE's testimony, the ALJ concluded at step four that Wallace was able to perform her past relevant work as a clerical worker as she actually performed it. (AR 27-29). Therefore, Wallace's claim for DIB was denied. (AR 29).

### C. *The ALJ's Step-Four Finding Is Not Supported by Substantial Evidence*

Wallace challenges the ALJ's step-four finding that she could return to "her past relevant job of clerical worker as she actually performed it" (AR 29), asserting that the RFC does not adequately account for her various impairments, including her frequent bathroom needs. For the following reasons, Wallace's argument is persuasive, as the ALJ's step-four finding is inconsistent with earlier statements in her decision, and as such, is not supported by substantial evidence.

At step four, the ALJ must determine whether a claimant can perform her past relevant work given her assigned RFC.[6] 20 C.F.R. § 404.1560(b)(2). A claimant must be found "not disabled" if she retains the RFC to perform either "[t]he actual functional demands and job duties of a particular past job" or "[t]he functional demands and job duties of the occupation as generally required by employers throughout the national economy." *Wolfe v. Shalala*, 997 F.2d

---

[6] For purposes of a step-four analysis, past work experience is "relevant" when it was (a) done within the last 15 years; (b) lasted long enough for the claimant to learn to do it; and (c) was SGA. 20 C.F.R. § 404.1565(a); *Lauer v. Bowen*, 818 F.2d 636, 639 (7th Cir. 1987).

321, 323 (7th Cir. 1993) (citations omitted).

The ALJ seemingly accepted Wallace's assertion that she needed four or five 15-minute bathroom breaks in an eight-hour workday. As such, the ALJ explained at step two of her decision that she was limiting Wallace to work with a "flexible pace," explaining that "[t]he need for a flexible pace is due to the fatigue she has from her [MS] and also helps to accommodate her bathroom needs." (AR 22).

At the hearing, the ALJ posed a hypothetical to the VE matching the limitations in Wallace's RFC, including the restriction to work with a "flexible pace." (AR 65). The VE responded that such an individual could perform Wallace's past relevant jobs as a clerical worker as she described them. (AR 66). The ALJ then asked:

> ALJ: Now, she described taking breaks of about 15 minutes, four times per day, is that typical . . . of the job as a clerical worker? Would that typically be tolerated?
>
> VE: No, Your Honor. It would not. That would exceed the tolerances of competitive employ[ment] or a person being off task or away from the workstation.

(AR 66). The ALJ then inquired about the typical tolerance for breaks in competitive employment, and the VE responded:

> VE: Your Honor, typically in competitive employment one is given two breaks. That is a 15 minute break in the morning, 15 minute break in the afternoon. And generally speaking, a 30 minute lunch. . . . An additional 15 minute break [] four to five times a day is about an hour and fifteen minutes and that exceeds the tolerance of typical breaks in competitive employment.

(AR 66). Considering the foregoing testimony by the VE, the Court is not convinced that a limitation to work with a "flexible pace" accounts for a claimant's additional breaks away from the workstation.

Making matters worse, the ALJ's step-four finding is inconsistent with her statements earlier in the decision. To review, at step two the ALJ stated that she was limiting Wallace to work with a "flexible pace . . . to accommodate her bathroom needs . . . ." (AR 22). Later, at step four, however, the ALJ reasoned:

> In comparing the claimant's [RFC] with the physical and mental demands of the job of a clerical worker as the claimant actually performed it, the undersigned finds that the claimant is able to perform it as actually performed based upon the [VE's] testimony. . . . *She would not be away from her workstation in excess of normal break times and she can sustain a flexible work pace*.

(AR 28 (emphasis added)). Thus, the ALJ's statement at step two and her finding at step four are in direct conflict with each other. As such, the Court cannot trace the ALJ's logic with respect to her step-four finding. *See Clifford*, 227 F.3d at 874 (stating that the Court "must be able to trace the ALJ's path of reasoning" (citations omitted)).

Contrary to the ALJ's step-four finding (AR 28-29), there is no evidence that Wallace could perform all of her past relevant clerical jobs as she actually performed them. Wallace did not require frequent bathroom breaks until she returned to work in August 2012 after her cancer treatments. Therefore, the ALJ's step-four finding that she could perform all of her past clerical jobs as she actually performed them before August 2012—without frequent bathroom breaks—is not supported by substantial evidence.

The Commissioner argues that even if the ALJ should have included a limitation in the RFC to allow Wallace frequent bathroom breaks beyond those typically allowed by employers, the ALJ's failure to include this limitation is merely a "harmless error." *Shramek v. Apfel*, 226 F.3d 809, 814 (7th Cir. 2000) (explaining that harmless errors are those that do not ultimately impact the outcome of the determination). This is because Wallace performed her most recent

14

clerical job from August 2012 to February 2013 *with* frequent bathroom breaks. Given that the VE testified that frequent bathroom breaks were not typically tolerated for clerical work, this error is not harmless.

Additionally, the Court is not convinced that Wallace's work from August 2012 to February 2013 constitutes SGA, and thus, past relevant work. *See Lauer*, 818 F.2d at 639 (explaining that previous work must rise to the level of SGA to be considered "past relevant work" at step four). Wallace testified that she was not physically or medically ready to return to work in August 2012 after her cancer treatments, but that she returned to work only because she would otherwise lose her job and her health benefits, which she needed to pay for her cancer treatments. (AR 42, 62-63). The ALJ did not address Wallace's proffered reason, which is important evidence, in her decision. *See Wilder v. Apfel*, 153 F.3d 799, 801 (7th Cir. 1998) (holding that a claimant's necessity to work out of financial desperation does not mean that one is actually fit to work); *Jones v. Shalala*, 21 F.3d 191, 192 (7th Cir. 1994) (same); *see generally Diaz v. Chater*, 55 F.3d 300, 307-08 (7th Cir. 1998) (stating that an ALJ must articulate, at least at some minimum level, his analysis of the evidence to allow the reviewing court to trace the path of his reasoning and "be assured that the ALJ considered the important evidence").

In sum, the ALJ's step-four finding that Wallace can perform all of her prior relevant work as a clerical worker as she actually performed it is not supported by substantial evidence. Accordingly, the Commissioner's final decision will be remanded.

*D. The ALJ Failed to Adequately Consider the
Combined Effect of Wallace's Impairments*

Wallace also argues that the ALJ failed to adequately consider her complaints of fatigue in light of the combined effect of her MS, her cancer treatments and resulting chronic diarrhea,

15

and her spinal compression fractures. Wallace's argument is persuasive.

The Seventh Circuit has acknowledged that the "combination of impairments could impose greater restrictions than of [the claimant's] impairments taken singly." *Thomas v. Colvin*, 745 F.3d 802, 807 (7th Cir. 2014). Wallace testified that fatigue was one of the reasons she thought that she could not return to work. (AR 50). She attributed this fatigue to not only her MS, but also to her cancer treatments and her spinal compression fractures. (AR 47, 56-57).

The ALJ, however, addressed Wallace's fatigue only with respect to her MS. For example, the ALJ stated at step two that "[t]he need for a flexible pace is due to the fatigue she has from her [MS] . . . ." (AR 22). When determining Wallace's credibility, the ALJ wrote that "the claimant's testimony about the extent of fatigue caused by her MS is not entirely credible." (AR 25). And when assigning Wallace's RFC, the ALJ noted that she needed a flexible work pace, in part, to "accommodate[] having some fatigue from MS . . . ." (AR 22). The ALJ then discounted Wallace's complaints of symptoms stemming from her MS, including her fatigue, on the premise that her MS had been "stable." (AR 25).

The ALJ's reasoning, however, failed to consider that Wallace's fatigue increased after incurring her more recent spinal compression fractures, adding to the fatigue that was already present from her MS and her cancer treatments. (AR 56-57). As such, the ALJ seemingly ignored the cumulative effect of Wallace's various serious medical conditions, and the treatment for them, on her fatigue. *See Thomas*, 745 F.3d at 807 (remanding the ALJ's decision where the ALJ considered each category of impairments *seriatim*, stating that taking all of the claimant's impairments together would likely result in a more restricted RFC than formulated by the ALJ). Therefore, the ALJ is directed on remand to consider the effect of the combination of Wallace's

16

various impairments on her fatigue and other symptoms.

## V.  CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is REVERSED, and the case is REMANDED to the Commissioner for further proceedings in accordance with this Opinion and Order.  The Clerk is directed to enter a judgment in favor of Wallace and against the Commissioner.

SO ORDERED.

Enter for this 29th day of September 2015.

s/ Susan Collins<br>
Susan Collins<br>
United States Magistrate Judge